76 P.3d 732 (2003)
118 Wash.App. 365
STATE of Washington, Respondent,
v.
Michael Owen FREEMAN, Appellant.
No. 50583-1-I.
Court of Appeals of Washington, Division 1.
September 15, 2003.
*734 David B. Koch, Catherine L. Floit, Nielsen Broman & Koch PLLC, Seattle, WA, for Appellant.
Dennis J. McCurdy, King County Deputy Pros. Atty., King County Prosecutor's Office, Seattle, WA, for Respondent.
*733 KENNEDY, J.
Michael Freeman appeals his sentence for first degree assault and first degree robbery, contending, inter alia, that the trial court erred by failing to find that the crimes merged for sentencing purposes, thereby placing him in double jeopardy. He also contends that the trial court erred by failing to treat the convictions as the same criminal conduct for purposes of calculating his offender score. We reject these and Freeman's remaining contentions and affirm the judgment and sentence.

FACTUAL BACKGROUND
In the early morning hours of October 29, 2001, Javon Pitchford telephoned a woman friend. A man answered the call, and Pitchford could hear a party going on in the background. Pitchford and the man arranged for Pitchford to be picked up and taken to the party.
A short time later, Michael Freeman and several unidentified males arrived to pick up Pitchford. When Pitchford got into the car, he and Freeman immediately recognized each other and exchanged greetings. They had been childhood friends, but had only seen each other a few times since they were children. Pitchford could not remember Freeman's last name.
Pitchford wanted to buy some beer and cigarettes before going to the party, so the group drove to a store. Freeman began talking about the drug ecstasy and told Pitchford, "I hope you got some money." Pitchford believed the three men were on drugs.
After Pitchford bought the beer and cigarettes, he got back into the car and the group drove off. But instead of taking Pitchford to the party, the men drove him to a dark, dead-end street in the Sea-Tac area where they backed the car into a driveway. Freeman then got out of the front seat, opened the backseat door, pointed a .45 caliber handgun at Pitchford, and said, "Come out your stuff." Pitchford responded simply by saying, "Mike?" to which Freeman responded, "What, you think I won't shoot you?"
Without waiting for an answer, Freeman fired a shot at Pitchford. Doctors later determined that the bullet passed through Pitchford's arm, lung, diaphragm, and liver, traversed his large intestine, lacerated a major artery, passed through his small intestine, and blasted a hole in his sigmoid colon. Pitchford instinctively tried to escape out the other side of the car but Freeman came around to that side and demanded, "Come out your stuff or I'll shoot you again." Pitchford gave Freeman all his money, and the men drove off, leaving Pitchford lying in the middle of the street.
Pitchford was able to stand and walk a few steps down the street. Just then, a taxicab came around the corner. The cabdriver drove Pitchford to a nearby store where medics and police were called. The next thing Pitchford remembers is waking up three days later in the hospital.
Pitchford arrived at the hospital in critical condition but miraculously survived the shooting and was able to tell police that the shooter was a childhood friend named Michael, who was a gang member, and to give police a physical description. Police prepared a photomontage consisting of six known gang members whose first names were Michael, and who generally fit the *735 physical description provided by Pitchford. Pitchford immediately picked Michael Freeman's photo out of the montage and stated that he was 100 percent certain that Freeman was his shooter.

PROCEDURAL HISTORY
Freeman was charged on February 25, 2002 with one count of first degree assault and one count of first degree robbery.[1] Both charges carried a firearm enhancement.
A jury found Freeman guilty of both counts, along with the firearm enhancements. He received a standard range sentence of 111 months for the first degree assault, 41 months for the first degree robbery to run concurrently with the sentence for the assault charge, and 60 months for each of the firearm enhancements to run consecutively with the sentence for the two counts and with each other, resulting in a total term of 231 months.
At sentencing, Freeman argued that his first degree assault and first degree robbery convictions arose out of the same criminal conduct under RCW 9.94A.589(1)(a), and thus should not score against each other. He also argued that the crimes merged, so that sentencing based on both counts was a violation of double jeopardy rules.
The trial court rejected these arguments, stating that it was "clear that the shooting of Javon Pitchford was not necessary to accomplish the robbery. It was gratuitous ... one could almost say a cold-blooded afterthought to and not just an adjunct of the robbery[.]" Report of Proceedings 5/24/02 at 435. In essence, the court ruled that what began as a robbery ended up as a shooting after Freeman's subjective and objective intent changed and he decided to shoot Pitchford. Accordingly, the court ruled that the robbery and shooting were not the same criminal conduct, and that because there was no clear evidence that the Legislature did not intend to punish both crimes, the offenses did not merge and the sentence did not violate double jeopardy rules.
Freeman appeals.

ANALYSIS
1. Merger
The double jeopardy clause of our State Constitution, which is given much the same interpretation as the U.S. Supreme Court gives to its federal counterpart, states that no person shall be "twice put in jeopardy for the same offense." State v. Gocken, 127 Wash.2d 95, 109, 896 P.2d 1267 (1995); Wash. Const. art. I, § 9; U.S. Const. amend. V. Within these constitutional constraints, however, the Legislature has the power to define and assign punishment for criminal conduct. State v. Calle, 125 Wash.2d 769, 776, 888 P.2d 155 (1995). Accordingly, the Legislature has explicitly provided that some criminal conduct that violates more than one criminal statute also merits multiple punishments. Calle, 125 Wash.2d at 776, 888 P.2d 155, citing Albernaz v. United States, 450 U.S. 333, 344, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981).[2]
*736 Neither the robbery nor the assault statute expressly allows multiple punishments for an assault that takes place during a robbery. See RCW 9A.56.010-310 and 9A.36.011-150. We therefore turn to rules of statutory construction to determine whether the two crimes may be punished cumulatively. Calle, 125 Wash.2d at 777, 888 P.2d 155. We review a trial court's decision on merger de novo. State v. Johnston, 100 Wash.App. 126, 137, 996 P.2d 629 (2000).
The "merger doctrine" is one means used to determine whether the Legislature has authorized multiple punishments. State v. Vladovic, 99 Wash.2d 413, 419 n. 2, 662 P.2d 853 (1983).[3] Merger applies only where the Legislature has clearly indicated that in order to prove a particular degree of crime, the State must prove not only that a defendant committed that crime but also that the crime was accompanied by an act which is defined as a crime elsewhere in the criminal statutes. Vladovic, 99 Wash.2d at 420-21, 662 P.2d 853. An exception to merger applies where the offenses committed in a particular case have independent purposes or effects. Thus, a crime that involves "some injury to the person or property of the victim which is separate and distinct from and not merely incidental to the crime of which it forms an element" may be punished separately. Id. at 421, 662 P.2d 853, citing State v. Johnson, 92 Wash.2d 671, 680, 600 P.2d 1249 (1979), disapproved on other grounds by State v. Sweet, 138 Wash.2d 466, 478-79, 980 P.2d 1223 (1999).
As Freeman points out, robbery is a crime that can be elevated to that of the first degree by the infliction of bodily injury as well as by the display of a weapon such as a firearm. Freeman relies primarily upon State v. DeRyke, 110 Wash.App. 815, 41 P.3d 1225 (2002), review granted, 148 Wash.2d 1001, 60 P.3d 1211 (2003), aff'd, 73 P.3d 1000 (2003) for the proposition that the first degree assault in this case must be merged into the first degree robbery.[4] In DeRyke, the defendant was convicted of both first degree kidnapping while armed with a deadly weapon and attempted first degree rape while armed with a deadly weapon after he abducted a young girl at gunpoint and took her to a wooded area where he attempted to rape her before he was frightened off by a passerby. 110 Wash.App. at 818, 41 P.3d 1225. Under Washington's criminal code, forcible compulsion by use of a deadly weapon and kidnapping the victim serve as independent bases upon which to elevate a rape charge to that of the first degree. Id. at 823, 41 P.3d 1225, citing RCW 9A.44.040(1)(a), (b). The jury was instructed that either kidnapping or display of a deadly weapon could elevate the alleged attempted rape to that of the first degree, and the jury was not asked to specify which act it chose to reach its verdict on the attempted rape charge. We said that "[p]rinciples of lenity require us to interpret the ambiguous verdict in favor of DeRyke." Id. at 824, 41 P.3d 1225. Accordingly, we assumed that the jury based its verdict for the attempted rape charge on the kidnapping rather than on the display of a deadly weapon. Id.
Here, the jury was instructed that it could convict Freeman of first degree robbery if it found that he unlawfully took personal property from Pitchford by inflicting bodily injury or by displaying a weapon. The jury convicted Freeman of both first degree assault and first degree robbery and *737 returned a special verdict that he was armed with a firearm during the commission of both offenses. Freeman argues that the result in his case on the merger issue ought to be the same as in DeRyke. We disagree.
First, no issue of lenity arises with respect to the jury verdict in Freeman's case because under the undisputed facts, the verdict is not ambiguous. Freeman presented an alibi defense at the trial. The evidence was undisputed that the robber both displayed a firearm in the course of the robbery and deliberately shot Pitchford, causing great bodily harm. The only disputed issue was whether Freeman was the robber and shooter. Having rejected Freeman's alibi defense, no rational juror could have believed that Freeman did not both display a firearm in the course of the robbery and intentionally inflict great bodily harm by intentionally shooting the victim with that firearm.
Moreover, unlike the kidnapping in DeRyke which was one of the independent bases for elevating the attempted rape charge to that of the first degree, "inflicts bodily injury" for purposes of the first degree robbery statute is not defined as a crime elsewhere in the criminal code. "Inflicts bodily injury" as used in the first degree robbery statute is not synonymous with assault, for assault requires an intentional act. See RCW 9A.36.011 (assault in the first degree requires intent to inflict great bodily harm); State v. Byrd, 125 Wash.2d 707, 713, 887 P.2d 396 (1995) (second degree assault committed by means of placing another in apprehension of harm requires proof that the defendant acted with an intent to create in his or her victim's mind a reasonable apprehension of harm); State v. Eastmond, 129 Wash.2d 497, 503, 919 P.2d 577 (1996) (second degree assault committed by means of attempted battery requires proof of actual intent to injure); State v. Esters, 84 Wash.App. 180, 185, 927 P.2d 1140 (1996) (second degree assault committed by means of actual batterya consummated assaultrequires an intentional touching or striking or shooting that recklessly inflicts substantial bodily harm, but does not require specific intent to inflict substantial bodily harm). But bodily injury inflicted in the course of a robbery need not arise from an intentional actthe infliction of injury in the course of a robbery can be inadvertent and nevertheless elevate the robbery to that of the first degree. See State v. McCorkle, 88 Wash.App. 485, 500-01, 945 P.2d 736 (1997), aff'd, 137 Wash.2d 490, 973 P.2d 461 (1999) (Intent to cause bodily injury is not an element of robbery in the first degree based on infliction of bodily injury in the course of the robbery; thus, McCorkle's contention that he did not have the requisite intent to support his plea of guilty to robbery in the first degree because he inflicted injury without conscious thought had no relevance to the validity of his guilty plea. The intent required to prove robbery in the first degree is intent to deprive the victim of personal property, not intent to inflict bodily injury).
We recognize that the case law regarding merger of assault into robbery in the first degree based upon infliction of bodily injury is seemingly in conflict. For example, in State v. Springfield, 28 Wash.App. 446, 451-52, 624 P.2d 208 (1981) the court affirmed the defendant's first degree robbery conviction based on infliction of bodily injury but vacated his conviction for second degree assault based on infliction of the same injury, based on merger principles. See also State v. Bresolin, 13 Wash.App. 386, 394, 534 P.2d 1394 (1975) (vacating second degree assault conviction based on merger with robbery conviction); State v. Davis, 47 Wash.App. 91, 98, 734 P.2d 500 (1987) (accepting without analysis the State's concession that first degree assault and first degree robbery convictions merged). But see State v. Prater, 30 Wash. App. 512, 515-16, 635 P.2d 1104 (1981) (first degree assault conviction based on gratuitous shooting of husband during armed home-invasion robbery could stand as it was not part of the robbery, but first degree assault conviction based on striking of wife in head with a firearm merged with the robbery, it being part of the force that was used to induce her to find money, the object of the robbery); State v. Cole, 117 Wash.App. 870, 73 P.3d 411 (2003) (appellant's convictions for attempted first degree robbery and second degree assault, both arising from use of a knife during the attempted robbery, did not violate the prohibition against double jeopardy; the offenses are not the same in law, and *738 do not merge under the test in State v. Johnson, 92 Wash.2d at 680, 600 P.2d 1249, because the State did not have to prove assault or any other offense to elevate the attempted robbery to that of the first degree; it only had to prove that the defendant used the knife to the point of taking a substantial step toward one of the three ways that first degree robbery can be committed).
Much of the seemingly conflicting case law predates our Supreme Court's seminal decision in State v. Calle, 125 Wash.2d at 769, 888 P.2d 155 et. seq. And some of it, Springfield for example, seems implicitly to rely upon the "same conduct" test for double jeopardy, a rule which is now defunct for purposes of both state and federal double jeopardy analysis. See State v. Gocken, 127 Wash.2d at 101-02, 896 P.2d 1267; Cole, 73 P.3d at 412. Moreover, we respectfully submit that the Springfield court misapplied the Johnson merger test. The convictions in Johnson were for first degree rape, first degree kidnapping and first degree assault. The sole purpose of the kidnapping and assault was to compel the victims to submit to sexual intercourse, and they suffered no injury that was greater than or that was separate and distinct from and not merely incidental to the rape. Accordingly, the kidnapping and assault of each victim merged with the rape. Johnson, 92 Wash.2d at 680-81, 600 P.2d 1249.
That the result would have been different if the defendant Johnson had used the knife to inflict actual injury in the course of the assault is made clear in State v. Vladovic, 99 Wash.2d at 421, 662 P.2d 853 wherein the court said:
An exception to the merger doctrine expressed in Johnson I and applied in [State v.] Allen [94 Wash.2d 860, 621 P.2d 143 (1980)] is that if the offenses committed in a particular case have independent purposes or effects, they may be punished separately. The robbery conviction in the case before us cannot stand unless it involved "some injury to the person or property of the victim or others, which is separate and distinct from and not merely incidental to the crime of which it forms an element." Johnson I, 92 Wash.2d at 680, 600 P.2d 1249.
Thus, even though it was the first degree robbery of one victim that elevated the kidnappings of four other victims to that of the first degree in Vladovic, the kidnapping and robbery convictions did not merge. There being more than one victim of the kidnappings, there was "`some injury to the person or property of the victim or others, which is separate and distinct from and not merely incidental to the crime of which it forms an element.'" Id. at 421-22, 662 P.2d 853, quoting Johnson I, at 680, 600 P.2d 1249. The Vladovic court also abrogated its earlier dictum in State v. Allen, 94 Wash.2d 860, 864, 621 P.2d 143 (1980) stating that "had the kidnapping merely been incidental to the robbery, the former offense would have `merge[d] into the robbery as a matter of law.'" Vladovic, 99 Wash.2d at 420, 662 P.2d 853.
Freeman argues that because the infliction of injury upon Pitchford in the course of the robbery was the same act upon which the first degree assault charge was based, the Legislature could not have intended both convictions for that single act of shooting Pitchford to stand. This is the equivalent of arguing that the first degree assault was "merely incidental" to the robbery so that the crimes must merge as a matter of law the very dictum from Allen that was abrogated in Vladovic. Pitchford lost his money as a result of the robbery; he very nearly lost his life as the result of the first degree assault. These were separate and distinct injuries to the same victim, and as such, we conclude that they fall under the exception to the merger doctrine as pronounced in Johnson and Vladovic. Moreover, the "inflicts bodily injury" means of elevating robbery to that of the first degree does not require proof of an act that is defined as a crime elsewhere in the criminal code, for example, assault, because the infliction of injury need not be intentional to raise the level of robbery to that of the first degree. Under the facts of this case, we find it impossible to conclude that the Legislature intended for the first degree assault to merge into the robbery so as to go unpunished. We also observe that Freeman's argument is simply a *739 restatement of the "same conduct" test that is no longer acceptable for purposes of federal or state double jeopardy analysis. Gocken, 127 Wash.2d at 101-02, 896 P.2d 1267; Cole, 73 P.3d at 412.
In sum, we affirm the trial court's determination that Freeman was not placed in double jeopardy because we conclude that the offenses of which he was convicted did not merge for sentencing purposes.
2. Same Criminal Conduct
We review a trial court's determination regarding same criminal conduct for abuse of discretion or misapplication of law. State v. Maxfield, 125 Wash.2d 378, 402, 886 P.2d 123 (1994). Review for abuse of discretion is a deferential standard; review for misapplication of law is not. State v. Garza-Villarreal, 123 Wash.2d 42, 49, 864 P.2d 1378 (1993). Review for abuse of discretion is appropriate when the facts in the record are sufficient to support a finding either way on the presence of any of the three statutory elements that, taken together, constitute same criminal conduct. State v. Anderson, 92 Wash.App. 54, 62, 960 P.2d 975 (1998).
"Same criminal conduct" means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim. RCW 9.94A.589(1)(a). When determining whether two crimes share the same criminal intent, the only factor at issue here, courts focus on whether the defendant's intent, viewed objectively, changed from one crime to the next, and whether commission of one crime furthered the other. State v. Vike, 125 Wash.2d 407, 411, 885 P.2d 824 (1994).
Certainly, the evidence is sufficient to support Freeman's view of his own criminal conduct. By his theory, his only intent was to rob Pitchford, and he shot Pitchford because he did not respond immediately to the demand for money; thus he contends that the assault was done in furtherance of the robberyas evidenced by Freeman's threat to shoot Pitchford "again" if he did not turn over his money. Accordingly, Freeman asks us to hold that the trial court erred when it found that his assault and robbery convictions constituted separate criminal conduct for scoring purposes.
But the evidence is also sufficient to support the trial court's factual finding that in shooting Mr. Pitchford the defendant "did something far beyond what was necessary to merely further the robbery." Report of Proceedings 5/24/02 at 420. The court found that Pitchford offered no resistance and gave no indication that he was not going to give over his money. He merely repeated the name of his childhood friend in a questioning manner, "Mike?" as if to ask whether this was simply a bad joke or whether his old friend was seriously pointing a gun at him and seriously demanding his money. The trial court found the shooting to be "gratuitous. It was ... a cold-blooded afterthought" and "not just an adjunct of the robbery[.]" Id. at 435, 885 P.2d 824.
Viewed objectively, the intent required for robbery is the intent to deprive the victim of property; intent to cause bodily injury is not an element of robbery in the first degree. McCorkle, 88 Wash.App. at 501, 945 P.2d 736. Viewed objectively, the intent required for first degree assault is the intent to inflict great bodily harm. RCW 9A.36.011. The trial court was not legally bound to accept Freeman's self-serving depiction of his subjective intent merely to further the robbery by shooting Pitchford, even though the shooting clearly persuaded Pitchford that his old friend was not joking, and indeed was seriously robbing him at gunpoint. Because the evidence at trial was sufficient to persuade a fair-minded trier of fact that the shooting was a gratuitous, cold-blooded afterthought that went far beyond the force required to accomplish the robbery, we affirm the trial court's finding that the assault and robbery did not constitute the same criminal conduct.
3. Sentence Specificity
Freeman also contends that we must remand for resentencing because the sentencing court failed to specify the precise period of community custody.
Section 4.7 of Freeman's judgment and sentence provides for community custody of 24 to 48 months for the first degree assault, 18 to 36 months for the first degree robbery, or "for the period of earned release awarded *740 under [former] RCW 9.94A.150 whichever is longer[.]" Clerk's Papers at 98. Freeman argues that the court improperly used conflicting and ambiguous boilerplate form language and that his term of community custody cannot be determined by reviewing the judgment and sentence and its appendices. We rejected this same argument in State v. Mitchell, 114 Wash.App. 713, 59 P.3d 717 (2002), a case with a similarly stated sentence. Mitchell controls the analysis here, and we will not revisit the issue.
4. Pro Se Statement of Additional Grounds for Review[5]
In a pro se statement of additional grounds for review, Freeman contends that while viewing a photomontage, the victim identified "Michael Williams" as the person who shot him, and that detectives later produced a photograph of Michael Freeman and assured the victim that Freeman was in fact the guilty party. He also contends that the prosecutor had a duty to learn about this and disclose it to the defense, in that it provides evidence of another suspect, which he could have used at trial in order to plant the seed of reasonable doubt. He also suggests that the trial court abused its discretion with respect to the "Michael Williams" evidence.
The record reflects that Pitchford told police that he was shot by a childhood friend named Michael, whose last name he could not remember, but who was overweight and who belonged to a gang. Police put together a photomontage of known gang members named Michael who fit the description given by Pitchford.[6] Pitchford immediately picked Michael Freeman's photo from the montage and told police that he was a hundred percent certain that Freeman was the shooter. The same photomontage was shown to Pitchford's mother. She told police that she possibly had seen one of the men depicted in the montageMichael Williamsat the hospital a few days earlier.
It is clear that the prosecutor disclosed this information to the defense because the subject came up at a court hearing when the State made a motion to preclude the defense from mentioning "other suspect" evidence about Michael Williams during closing argument:
THE STATE: ... I wanted to make a motion to preclude defense counsel, like I did in pretrial, from mentioning other suspect evidence, to preclude the defense from arguing that Michael Williams is a suspect in this case. There's no evidence to suggest that he is a suspect.
We're not even close to presenting, like in other suspect evidence, that burden of proof by the defense that he was there, capable of doing it, and a possible suspect. We have that he was a Blood gang member, that he got thrown into a montage, and he may have been on a hospital floor. There's no evidence for the defense now to throw to the jury that he's a potential suspect, and I'd ask the Court to rule as such.
COURT: Mr. Stimmel.
MR. STIMMEL: Your honor, it is the State who first brought up the subject of Michael Williams through the testimony of the detective in having her describe how the montages got put together. I didn't mention Michael Williams; they mentioned Michael Williams. And now I don't think I should be precludedI honestly can't formulate a legal argument, except it's just not fair to cut me off from arguing what became of Michael Williams.
COURT: As I understand the standard, it's not clear that we have a record that would support other suspect argument. On the other hand, the jury has heard factual testimony.
I guess the easiest way for the Court to characterize it is it's related to the identification process of your client. I think there was an acknowledgment that there was some initial belief that perhaps the person that, as I understand it, the victim's mother may have thought the Michael was Michael *741 Williams. The jury heard that testimony.
But I do not believe that we have evidence that would make it fair to argue affirmatively that Michael Williams is a suspect. Now, they've heard it. We can't control what inference the jurors may make on their own, but I would assume the jurors would consider the testimony in the context that it was offered, which was not so much that he was a suspect, but that it was thought that he was somebodyobviously the mother was not present. She's trying to figure out from what her son is saying what Michael might be involved.
Report of Proceedings 3/4/02 at 304-05.
Nothing in the record supports Freeman's contention that Pitchford ever identified the shooter as Michael Williams. To the contrary, when he saw the montage, he immediately identified Freeman as the shooter. His mother, who was not present during the shooting, viewed the same montage, and told police that she had seen one of the men depicted in the montageMichael Williamsat the hospital, and the jury heard this evidence. Since there was no lack of disclosure by the prosecutor, and no identification by Pitchford of Michael Williams as the shooterand no evidence in the record whatsoever that police used impermissibly suggestive procedures during the photomontage identification processwe believe that Freeman must be asking us to review the trial court's ruling precluding the defense from arguing to the jury that Michael Williams was a viable "other suspect."
The trial court did not abuse its discretion in making this ruling. The "Michael Williams" evidence presented at trial did not rise to the level of "other suspect" evidence. In order for "other suspect" evidence to be admissible at trial, there must be such proof of connection or circumstances as tends to clearly point out someone besides the one charged as the guilty party. State v. Russell, 125 Wash.2d 24, 75-77, 882 P.2d 747 (1994). Because she was not present at the shooting, Pitchford's mother could not possibly identify the shooter. All that she could do was to try to help her son to ascertain the last name of his childhood friend. Having recently seen or possibly seen Michael Williams at the same hospital where her son was recovering from his injuries, she may have thought there might be some connection, but if so, this is a far cry from the kind of connection or circumstance that tends to clearly point out someone besides Freeman as the guilty party. Accordingly, the trial court did not err in precluding the defense from arguing that Michael Williams was a viable other suspect.
To the extent that Freeman may believe that evidence exists outside the record on appeal that Pitchford himself identified Michael Williams as his shooter, or that police used impermissibly suggestive procedures during the photomontage identification process, his remedy lies in a timely and properly documented personal restraint petition, and not this direct appeal. See State v. McFarland, 127 Wash.2d 322, 338, 899 P.2d 1251 (1995) (if a defendant wishes a reviewing court to consider matters outside the record, a personal restraint petition is the appropriate vehicle for bringing those matters before the court).
We affirm Freeman's judgment and sentence.
APPELWICK, J., and ELLINGTON, J., concur.
NOTES
[1] A person commits robbery when he unlawfully takes personal property from the person of another against his will by the use or threatened use of immediate force, violence, or fear of injury to that person. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking. The degree of force is immaterial. RCW 9A.56.190. The first degree robbery statute provides in relevant part:

(1) A person is guilty of robbery in the first degree if:
(a) In the commission of a robbery or of immediate flight therefrom, he or she:
. . . .
(ii) Displays what appears to be a firearm or other deadly weapon; or
(iii) Inflicts bodily injury[.]
RCW 9A.56.200.
The first degree assault statute provides in relevant part:
(1) A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm:
(a) Assaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death; or
. . . .
(c) Assaults another and inflicts great bodily harm.
RCW 9A.36.011.
[2] An example of express legislative intent authorizing cumulative punishment is the burglary statute, which includes the provision that "[e]very person who, in the commission of a burglary shall commit any other crime, may be punished therefor as well as for the burglary, and may be prosecuted for each crime separately." RCW 9A.52.050.
[3] Another commonly used means of legislative interpretation is the "same evidence" test, which asks whether the offenses are the same "in law" and "fact." Calle, 125 Wash.2d at 777-78, 888 P.2d 155; Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The parties agree that these offenses are not the same in law because they involve different legal elements, including different elements of intent. Accordingly, we need not discuss the same elements test. But we point out that where the offenses are not the same in law there is a strong presumption that the Legislature intended separate punishment for each offense, even if they are committed by a single act, and this presumption "should be overcome only by clear evidence of contrary intent." Calle, 125 Wash.2d at 780, 888 P.2d 155.
[4] The Supreme Court granted review of this court's decision in DeRyke and affirmed on a different issue from the merger issue relied upon by Freeman for this appeal. Review was not sought with respect to the merger issue.
[5] RAP 10.10 permits an appellant in a review of a criminal case to file a pro se statement of additional grounds for review to identify and discuss those matters that he believes have not been adequately addressed by counsel.
[6] The jury was not told that Freeman and the other men depicted in the montage were gang members, the trial court having ruled in limine that this information was too prejudicial to the defense.